All right, our second case today is Adriatic Marine v. Harrington. We'll first hear from Mr. Jones, the plaintiff. Good afternoon, and may it please the court. My name is Blake Jones. I'm representing the appellant, Ronald Harrington. In essence, we seek to remand to trial from summary judgment because we believe it is insufficient for a Jones Act seaman a ward of this court. Three issues are before you for consideration. One is maintenance and cure, as limited by McCorpin. The second is the Jones Act negligence, and I threw in unseaworthiness as kind of a combination. And number three, a motion to strike a portion of an expert witness's testimony on that. All that my opponent today agree on is the court's standard of review. We believe that summary judgment on maintenance and cure is considered under the de novo standard, a light most favorable, and with all reasonable doubt resolved to the non-mover. The same with the judgment on Jones Act and unseaworthiness, although there's a slight change in unsee. And on any motion to strike, it would be under the abuse of discretion standard. To begin with regard to the motion to strike, and I will address most of this in my brief and be very brief here because some of the issues really relate, as I appreciate them, in a more important fashion to the other two. We believe that there was a motion to strike that at the first time brought to our attention the issue relative to a calculation by one of our experts, and it was obviously an incorrect calculation. It was based on facts that he did not have. They were presented and it was resolved almost immediately and in a timely fashion. We requested an opportunity to correct it. It was timely. The judge denied it. We requested it again. The judge denied it, requested a third time. She denied it. We believe that this was an abuse of her discretion in part because the rationale given in her motion was not correct in our opinion. The correction would have been easily cleared up. The judge thought that the client with an admittedly low IQ, below his hat size in my view, could not have been, could have corrected it from the stand. That's really not correct. And there was not enough time for Mr. Wogan's side to prepare the expert. Well, as it turned out, I believe it was timely, but aside from that, the judge on her own motion in terms of being able to further consider all of the motions before her continued our trial for 30 days. We think there was plenty of time to do this. We ask his remand for an abuse of discretion. If it's permissible, let me move to the next issue, which is maintenance and cure under McCorpin. Basically, the facts here are very different from the usual McCorpin troika. As a child, Mr. Harrington saw doctors for occasional back pain, and that was a pediatrician, of course. The pediatrician actually sent him to an orthopedist after an x-ray was done a few months later, and this was some seven years before this accident, six and a half, maybe seven total altogether before his application. The orthopedist, Dr. Bennett, suggested upon reviewing the x-ray that that was probably not a good reading of the x-ray and suggested, in fact, and this was in, I believe you find it in the ROA 887 is his opinion. Then, a year later, when he applied for a job, you find very clearly that there was a clear x-ray read as normal, and that's going to be, I think, in 889. No problems for his back for five and a half years of hard labor jobs until he applied with Adriatic. In fact, the pre-employment job application with Adriatic, he circled some 60 items in three sections, which Mr. Rogan, I assure you, will point out to you. I believe it's 882 and 881. Basically, the three issues that are pointed out are that he circled within the circle a no to something called injured back forward slash back pain, injured neck forward slash with neck pain, and three, back surgery forward slash injury. All that he had ever been told was lumbago and the issues associated with any kind of anything more than that, whatever that is, was, in fact, something that was fully resolved with two subsequent x-rays showing that there was no problem that was apparently first noticed by the pediatrician, and we think misread because of the quote of Dr. Bennett, who was the orthopedist fully qualified some four months later saying that he didn't expect that that to be something that would be there with an 18-year-old man and attributed most of that to his overweight status. In addition, when we start talking about whether there's an intentional concealment, I think that's something that the court should look at and recognize. I think the way it was set out is confusing, and particularly to what is called a functionally illiterate person as found by one of our experts in an area that the judge did not throw out. And this, of course, is the non-movement semen and mitigates toward a trial and a denial of summary judgment. There are no injuries prior to this, no momentary or occasional complaints seven to eight years ago to his pediatrician, again, lumbago or whatever. There are no prior accidents, no prior lawsuits, no prior visits to emergency rooms, no prior visits to pediatrician for back claim for over six years. There's a normal x-ray of the neck and back from 2012, and I believe that is 889. There's six months on this job of very heavy labor. So this is something the judge needs to look at to take the veracity from the stand and not from some deposition that was not countered, was merely said as a discovery deposition. We did not respond to defend any of those things and just gave the deposition. With regard to Jones Act liability and unseaworthiness, the standard of review in the light most favorable to the non-movement, let's look at the facts. He's climbing out of a bilge without ladder or assistance. He's a 300-pound man squeezed into a tight hole, clean fuel spill and oil and grease from bilge near the main engine. He brought tools with him. In the judge's opinion, there was some question about oil and that sort of thing. Well, obviously he was cleaning the bilge because of the requirement. He'd been doing so for four or five days. I think this was the fifth day because he'd gotten all the way up to the front, and that was because of what he was told was a spill of fuel oil. Bilges are nasty, dirty things. If any of you have ever seen them, I don't think any district court judge would require an expert for us to testify as to that. What did he have with him? He had rags to clean up water and oil. He had pads to absorb oil as best he could. So he's going down about four feet into the access hole, according to him, and then fell when his foot slipped on a round elbow-shaped pipe. As he's climbing out, he's trying to come out. The question is whether he had oil or grease on his feet. Possibly he did. Possibly he tried to wipe it off. Possibly he could or couldn't have. The real answer is that there's no way for him to get out because what he's got—and it's really easy to look at this. I think page seven of the brief of our opposition shows you the hole and shows you the pipe. The only way that he can put his 300-pound frame is to put one foot on that pipe. It's about a two-inch round piece of—I can't tell if it's plastic or metal. In that circumstance, he can only put a part of his foot on it. It is a round surface. This is not what any person designing ingress and egress interior to a vessel would allow. You have to have a formal ladder with steps, or at worst, you have to have something that would give us some help on a nonstick surface. The comparison with the bilge cleaning and the other issues, of course, is there's an alternative way of doing this. What you have is a situation where they did this once before in a harbor where the boat was at the dock. Not a rolling sea, not anything else, with help. Somebody could have lifted him out. This did not happen. The judge, in this case, created her own version of proof and said, you know, why can't you do this or that? We think that that's not an obligation of the seaman to what the facts were. In fact, I probably would have not let him do that. I would have considered that fraud, frankly. There are two cases worthy of note. One is Josh versus Nautical Services, I believe, before Judge Weiner a good bit ago. Basically, the district court had a full trial, found maintenance and cure was not appropriate, and gave 50-50 on Jones Act negligence. With regard to the comp case, it's very clear. Six months before he had filed a maintenance and cure case, he filed a comp action. It's very, very clear that he was committing a fraud. Those things are very different here. There is no fraudulent concealment. There is nothing in light of the Harrington circumstances to relate to that or any of the McCorpin-type cases. If you look at the actual issue that he had with regard to possible back injury, seven years ago, totally resolved by an orthopedist and later read as no. He questioned the veracity. I think that was exactly his words. The normal x-ray in a year later and the normal x-ray at the time of his application. Jones, let me jump in for a second. Forgive me, but just a quick causation question. Just flush out for me, how is it that Adriatic Marines assigning him to clean the bilge by himself, despite his size, caused his injury? Rather readily, Your Honor. He had no way to get out of the bilge without putting himself at risk trying to get out with this piece of pipe. When he had it done before, there was one done a few months prior where he had help. That person can grab him and help him get out. If he slips, he doesn't slip all the way. He doesn't hurt himself. Without having a helper, that's the first problem. The second problem is the lack of means of ingress and egress. He could probably just do something to put some sort of fixed plate where he could have the opportunity to actually place his foot and move up. How can we kind of draw this inference that he slipped on oil when there's no evidence of oil on his shoes or on the pipe at the time that he fell? Well, I think that you don't have to do that when you see that he's putting his foot on a slippery surface to begin with, a round surface. You can't have any kind of stairwell or anything on a boat that allows you to use your foot in that situation. I do believe that there was probably oil present on his foot, and the testimony, I believe, in his deposition shows that he couldn't even see the bottom of his feet because of his size and how he was trying to take himself out there when it did come in. He said something like that, and we need to clear that up at a trial because, in fact, he may have tried to clean his foot improperly, and it didn't work. But the oil on the ... There's no way just to prove that unless, I guess, he goes back and takes pictures and tries to set a case, and it's not his obligation to do so, Your Honor. Just to finally ... Would I have another minute? I don't know. You're out of time. You can wrap up in a sentence or two, and you can get rebuttal. You have five minutes for rebuttal later. Okay. I'll reserve that because I think the Jones versus U.S. to Knox case would resolve that. I'll save that for later. Thank you. All right. Thank you, counsel. We'll now hear from defense counsel. Good afternoon, Your Honors. Ford Logan on behalf of the Adriatic Marine. Judge Willett, I'm going to jump into your question just now that Mr. Jones was answering because I think if you look at the arguments that are being made, what Mr. Jones is really testing ... Mr. Jones is really arguing is that there was some sort of design defect issue with respect to the pipe and how this bilge was constructed. Well, that's a new argument. That was not an argument that was raised before the district court. It's not an argument that was raised in the briefing. What we do know from the facts is that there just is simply nothing other than speculation as to how this accident allegedly happened. Mr. Harrington testified when asked directly, how did this accident occur? He said, I don't know. If you look at the facts, which are uncontested in this respect, you can't make that jump from purely speculative to even potentially circumstantial evidence, which might get you over the slight causation standard for the Jones Act. Probably wouldn't get you there for the seaworthiness claim, but it might get you there for the Jones Act. He doesn't know how he fell. He doesn't know if there was oil on his shoes. He testified that he did know and he did look at the pipe and there was no oil on the pipe. He testified that he used a shop vac, that he used rags and oil at first. He then gets into the bilge. There is a dispute, which wasn't at issue with respect to these motions, but there's a dispute as to whether or not this accident even happened because of the allegations about how he was, how he possibly could even crawl under the pipe to clean it. That said, if you look at what he admits to in the statement of uncontested facts, which the complete lack of causational evidence to satisfy his burden of proof with respect to the Jones Act, whether that's a slight causation or with respect to the seaworthiness claim, approximate cause, substantial factor. This leads directly into what Mr. Jones, I think was alluding to and what he'll discuss on rebuttal, but it's the Jones versus United States case. And we make the point in our prong, which is a critical element of both of the Jones Act negligence and the unseaworthiness claims. Because without that causational prong linking the alleged negligence to the injury, he can't satisfy his burden. And he can't do that because, again, what we've seen at the district court level and what we're seeing here is these arguments of counsel as to how this accident may have occurred. They don't fly with the facts that were submitted, the competent summary judgment evidence that was submitted to the district court to decide this issue. Speculation, as we know, can't defeat summary judgment. I think there's a telling quote that was cited to Judge Bitter at the district court level from a decision by Judge Fallon, where he's talking about how you resolve the factual controversies. And typically, yes, you resolve them in favor of the non-moving party, but only when there is an actual controversy. We would submit that there isn't an actual controversy when you look at what the uncontested facts are. He simply doesn't know how this accident occurred. We're now here in front of this panel with arguments about, well, he may have could have slipped on this or there was a design defect. Putting aside whether or not those issues were waived because they weren't raised at the district court level, we're still at the speculative point. So we're no further along in determining how this accident occurred than we were at the time the judgments were filed at the close of discovery, at the time where Mr. Harrington should have come forward with some evidence to show that he could at least raise a genuine issue of fact with respect to causation. Just shifting gears, I'd like to talk about the McCorpan issue because I think there are a couple of things that we need to flesh out and focus on. The point was made that Mr. Harrington is a functional illiterate. Well, respectfully, that's a subjective argument that I don't think was properly raised in front of the district court. But nonetheless, that goes into the subjective prong, which if you look at Brown versus Parker, if you look at what the Fifth Circuit says about interpreting the intentional misrepresentation prong, first prong of McCorpan, you can't do that. You don't have a subjective component because otherwise you wouldn't have a McCorpan claim, right? You wouldn't have a McCorpan defense because a plaintiff would be in a position to say, oh, well, I didn't know that this was something that you wanted to disclose. Instead, what the case has said is- Well, it'd be for the jury to hash out whether he's telling the truth or not. That happens all the time. I mean, there's a little odd. I mean, I see the case law you're talking about, but it is a little intentional, usually is about someone's subjective viewpoint. It's a little odd to say there's a requirement of intentional concealment, but we're not going to look into whether this person had that intent. The law is what it is. It is. It is. It's an argument that was raised in front of the district court level along the same grounds. The law is that you have to look at it objectively. You have to look at it within the context of whether or not there was pre-employment physical versus whether there wasn't. In this case, there was, so you're dealing with concealment. The plain fact is that Mr. Harrington admitted in discovery and request for admissions that he read in full and understood that September 2017 complete occupational health form health questionnaire. The argument now that, oh, well, he didn't really understand it or he was functionally illiterate is a little bit of an effort to try to dodge from that admission. I mean, that admission still holds. There was no qualification to that admission. So when you look at what the district court relied upon in reaching the ruling on intentional misrepresentation, the first prong was correct because one, it was understood. We know he had prior back treatment. We know he had prior back injuries. There's an argument as to whether or not, well, the degenerative disc disease was known. It wasn't known. Maybe it was questioned by a doctor and I'm going to discuss that in a second, but we know that he had prior injuries that he did not disclose. So the first prong is satisfied under the objective based. It's notable that the argument for Mr. Harrington focuses on this degenerative disc disease and whether or not it was accurately recorded or acknowledged by Dr. Bennett or the radiologist that took the x-rays. Well, the argument that's been presented before this panel is simply that. It's the argument of counsel. It's counsel's interpretation of what Dr. Bennett allegedly might have or would have said about this record. We don't know because Dr. Bennett was not deposed. There is no evidence with respect to what Dr. Bennett thought about this record or what it meant by what he meant by veracity or questioning the veracity. We don't know. What's been presented is the argument of Mr. Harrington that, oh, well, by veracity, he meant to question the accuracy of the degenerative disc disease diagnosis. Putting all that aside, Mr. Harrington undisputedly admitted again in statement of uncontested facts in responding to Adriatic's motion that he had been diagnosed with degenerative disc disease. He admitted that he had been diagnosed with a lumbar strain, and he admitted that he had previously been diagnosed with lumbago. He also admitted he didn't disclose any of this to Adriatic Marine. So even if you take the dispute, which I think is really a red herring of the degenerative disc disease, and you put it aside, you still have an issue where he has a prior history of lumbar and a prior history of lumbago. And if you look at the case law, Brown in particular dealt with this issue directly on point. You had a prior lumbar strain, and then you had a subsequent disc herniation, which is what Mr. Harrington complains of here. The Fifth Circuit and Brown took no issue in making the causal connection. I know I'm jumping ahead to kind of the third prong, but they took no issue in making that causal connection. In fact, they stated that you can have a history of a lumbar strain, and causally it'd be similar or satisfy the third prong of McCorpin when you have a subsequent herniation. The materiality prong, I'll just address quickly. There was no evidence submitted to refute what Adriatic Marine submitted in terms of materiality. Adriatic Marine submitted an affidavit stating that had it known this information, it would have undertaken additional efforts to determine the scope of prior injuries, whether or not Mr. Harrington was capable. Brown speaks to this as well, states that the fact that an employer asks a specific medical question on an application and that the inquiry is rationally related to the applicant's physical ability to perform his job duties renders that information material for the purposes of this analysis. Mr. Harrington even admitted that he was not in a position to respond to the materiality issue on summary judgment in responding to the statement of uncontested tax. Well, if he's not in a position to respond to it at the close of discovery, and this is a bench trial where the district court has a little more discretion in terms of ruling on summary judgment, then he's not going to be in a position at trial to present that evidence. It's not a but-for analysis. He didn't have any issues, five, six, seven years, so it must have been fine, or he didn't have any problems doing this job, so it must have been fine. There's no temporal cap to when the prior injury needed to have been. There's no, he could do the job, therefore the materiality wrong isn't satisfied. It's not a but-for analysis in that respect. Lastly, I touched on it briefly, but the third prong of prior and then as a result of the alleged accident to the same part of the body, the lumbar back, you have the lumbar strain, you have the lumbago, you have the degenerative disc disease. He's filed a lawsuit seeking to recover disc herniation of his lumbar spine as well as for degenerative disc disease. I'll touch briefly on the expert report issue. Obviously, it's moot if this court affirms Judge Vitter's rulings with respect to the corporate defense and liability to the extent that there is an issue. It was not solely a just a slight discrepancy with respect to the economic wage loss calculation. It was a information that was available at the time, but just wasn't properly considered. It's not an issue of whether or not the expert had those facts. He did. He wrongly interpreted on supplementation. It's not to allow you to come back after the fact and correct what was clearly an improper opinion based upon unreliable and insufficient facts under Rule 26. If that was the case, then you would sort of throw the scheduling order and the motion to limit the deadline and all that kind of out of the window because you would always have an opportunity to say, oh, well, let me come back and correct it. Well, it wasn't a matter of just simply misstating something. It was purely an unreliable opinion based upon incorrect facts. So, you have the wide discretion that the district court has provided. They have the opportunity to manage their docket as they see fit. That's what Judge Bitter did here. We don't think that supplementation was necessary. We filed it as an in limine to exclude. Just because she granted that and chose to exclude the opinion doesn't mean that they need to be provided the opportunity to supplement. Very last point that I'll make, and I'll be glad to address it, you have is that we know evidence that was submitted to the district court. Simply no evidence submitted to the district court that there was an ongoing fuel spill, that there was an ongoing unseaworthy condition. He was performing a bilge cleaning task that he does as part of his general engineering responsibilities. He testified that he knew how to do it. He testified that he didn't need any help. He clearly understood that task. There's no record evidence submitted. Had he been doing it? Was there a history of where in his employment did this come in, this injury happen? Two points on that. He testified that he had only done this one time before, months earlier at the dock with assistance. That's just simply not true because the vessel logs that were submitted and the evidence submitted to the district court showed that he had performed this bilge cleaning task four times in the four days prior to his alleged accident. The suggestion that he just didn't know how to do it, that's belied by the fact that he had done it four times in the four days leading up to it. That there's fuel or oil in the bilge doesn't mean that there's a spill or a leak. That's where fuel and oil accumulates on the vessel. It's supposed to be in the bilge. It's a standard place where that stuff is located, and it's a standard part of his job responsibilities as an be able to clean that up, be able to do it appropriately. He testified that he knew how to do it, and so this sort of after-the-fact Monday morning quarterback saying, well, he needed assistance or, you know, he shouldn't have ever been sent down there. Well, those were decisions he made. He never asked for assistance. No one ever told him you got to go stand in the bilge. No one ever said you got to, you know, use this pipe to get up and down. I mean, these are all decisions he made. That doesn't constitute negligence under the Jones Act. It doesn't constitute unseaworthiness under general maritime law. So, if there are any questions, I'll be glad to answer them. Otherwise, thank you. All right. Thank you, counsel. And Mr. Jones, you get the last word. Well, hopefully I can make it as concise as Mr. Wogan. Basically, let's look at Jones versus U.S. first. That was a case on speculation, and we agree that it was well found. Mr. Jones had non-skid on the deck of the Knox and suggested that maybe sometimes grease from a cable overhead would fall on a deck around there, but with no particular connection to the accident. You just couldn't connect the cables. It's not the case in Mr. Harrington's facts. Mr. Harrington, of course, had been working. I agree with Mr. Wogan that he had been working to clean the bilge for the prior four days of this. This was the fifth day. It was a very large spill. We might have to look at that as a trial and have the judge determine credibility on that because he's absolutely correct. It is easily found, and we would accept that and agree with it as something that should have been cleaned up, and it took a long time to clean it up. I think in his deposition he says his blue jeans turned black, so I'm quite sure that was the case. I take a little disagreement with Mr. Wogan with regard to the fact that bilges where oil and fuel accumulated only does that if there's a leak. It's not a place to hold it, I can assure you. The issue that we're really talking about here, though, with regard to the Jones Act and unseaworthiness in the Jones case and then looking at how accidents happen, let's look first at the fact that there was no way to have ingress and egress. That's an absolute interior to any vessel anywhere, any time. There's a two-inch round 90-degree elbow that you have to put one foot on to look at. Now, the easy way to do this is to look at the photograph, and I believe it's page seven of Mr. Wogan's book. I don't have the site in front of me right now, but that is there and gives you a clear understanding of how your foot could slip off, whether there was oil or not. But to suggest that if a guy's been slouching around in a bilge, that he got everything off to the point that there was absolutely nothing, that extends credulity beyond belief. He had to have something there on his foot, and he couldn't see it at the time. He says that. So what we're really looking at is an engine oil spill that was on the fifth day of a cleanup. He had oil soap pads. He had oil rags. His blue jeans turned black. He was in the bilge, for goodness sake, by the main engine. He was in a rolling sea, and he had done it successfully for four days, so I guess I have to admit to that. He was on a four-foot drop down from his base elevation in the engine room. He had to step up either three feet or one foot. It was very confusing as to where this pipe actually was. Then it was almost impossible to keep him from slipping off, whether grease was there or not. We think that it was because it's very clearly that's why he was there to clean up the grease. It was probably on his feet, and he couldn't get it off and couldn't see it at the time. In any case, what we have is a case that is not ripe for summary judgment, a case that credibility from the witness stand is what is needed, that unassailable facts in this matter separate Harrington from the cases cited by the plaintiff appellee. There is no back injury ever, if you base on the corrected information from seven years ago, between the orthopedist that looked at it and disputed the initial revelation. There's no way that a guy with this kind of limited education is going to be able to look at all of these issues and say, yeah, somebody said something, but he was wrong because obviously Dr. Bennett told him that was wrong. He wanted him to lose weight and gave him some physical therapy. The prior bridge bill's job was done at the dock without a rolling sea with a helper where it could help him up and help him back, and he made it. You can have an unseaworthy condition and a lack of training very readily on a set of steps that you step over with a rung missing, but it's still unseaworthy. All right. Thank you, counsel. The case is submitted. Thank you for your arguments, and you're both excused. Thank you.